UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PARAMETER LLC, doing business as   )
PARAMETER SECURITY,   )
   )
      Plaintiff,   )
   )
     v.   )      Case No. 4:19-cv-02743-AGF
   )
JOHN POOLE and WREN &   )
ASSOCIATES, LLC, doing business as   )
NETWORK TECHNOLOGY   )
PARTNERS,   )
   )
      Defendant.   )

## MEMORANDUM AND ORDER
## ENTERING A PRELIMINARY INJUNCTION

This matter is before the Court on the motion (ECF No. 27) of Plaintiff Parameter

LLC, d/b/a Parameter Security ("Parameter") for a preliminary injunction with respect to

its claims against Defendants John Poole ("Poole") and Wren & Associates, LLC, d/b/a

Network Technology Partners ("NTP"). The Court heard oral argument on this motion

on November 25, 2019.[1] Upon review of the entire record, including the evidence

properly before the Court for purpose of this motion, Parameter's motion for a

preliminary injunction will be granted in part, as set forth below.

---

[1] Although the parties originally intended to present evidence, including witness
testimony, at this hearing, the parties informed the Court shortly before the hearing that
they agreed to limit the hearing to oral argument and to rely on the evidence submitted in
connection with their briefs.

## BACKGROUND

Parameter is an information-security and digital forensics services company formed in 2007 by co-owners and married couple, Dave and Renee Chronister. Parameter is located in St. Charles, Missouri. It serves customers in more than 30 states and internationally, but its primary customer base is located in and around St. Louis, Missouri. Parameter's services include, but are not limited to: penetration testing, vulnerability assessments, web application testing, social engineering, managed vulnerability scanning, threat hunting, and virtual chief information security officer ("VCISO") services. Parameter also sells security information and event management ("SIEM") products.

## Poole's Employment with Parameter

Prior to his employment with Parameter, Poole had more than four decades of general sales experience, but he had no experience in selling information security and digital forensics services. Parameter hired Poole as an at-will employee on October 3, 2011. Poole began as a salesperson and learned about the information security and digital forensics industry through on-the-job training and working with Parameter founder, Dave Chronister.

In its written offer of employment, Parameter stated that Poole would report directly to Renee Chronister. In the same written offer, Parameter described Poole's compensation package and terms of employment as follows:

As discussed, you will report directly to Renee Chronister. Your compensation package will include a gross base annual salary of $35,000 annually to be paid on the 15th and last day of each month, supplemented by all other Parameter Security employee benefits. Your commission rate is 15% and will be paid out the following month on the 15th.

As an employee of the company, you will have access to certain confidential company information and you may, during the course of your employment, develop certain information which will be the property of the company. To protect the interests of the company, you will be asked to sign, as a condition of employment, the company's standard confidentiality agreement and non-compete agreement on the first day of employment. You will also be subject to initial and periodic background checks to include: criminal, credit and others deemed necessary by the company as well as initial and random drug tests. Failure to comply or failure of any of the aforementioned tests/background checks is cause for immediate termination.

Our company adheres to the policy of employment-at-will, which permits the company or employee to terminate the employment relationship at any time for any reason. Neither terms nor conditions contained in this employment proposal letter, nor any other written or verbal communication by a representative of our company are intended to create a contract of employment or a warranty of benefits.

ECF No. 29-3 at 22.

Poole's base salary increased every year, but throughout his employment, Poole's commissions made up a significant percentage of his total earnings at Parameter. Aside from the offer letter, there was no written document governing Poole's commission payments at Parameter or how those commissions were to be calculated. However, the parties agree that from his hire date of October 3, 2011 to at least July 2019, Poole was paid 15% commission for the sales of Parameter products, regardless of whether the sale

was to a new or existing customer.[2]  As to when commissions became due to Poole, there does not appear to be any dispute that, typically, Poole was not paid a commission until Parameter received payment from the customer, and Poole was then paid a commission the following month.  As Poole described it in his deposition in this case, "if we signed a contract in January, the first check came in February, I would be paid in March."  ECF No. 35-1 ("Poole Dep.") at 94:10-12.

Throughout his employment, Poole was Parameter's primary salesperson.  In June of 2018, Poole assumed the title of "Director of Sales," but this was a title change only.  Both before and after his title change, Poole was responsible for developing business leads and building relationships with potential and existing customers; assessing customer risks, needs, and specifications; selling Parameter's products and services, including Parameter's SIEM product AlienVault; and preparing and submitting proposals and statements of work.  As a function of these duties, Poole had regular access to Parameter's proprietary business information, including significant customer data, contact names, contract status and pricing information, and customer needs and specifications.  Aside from Parameter's two founders, who had some existing clients, Poole was the only Parameter employee whose role was predominantly sales-focused.

---

[2]     Parameter presented evidence that, as it began offering more services over the course of Poole's employment, it paid Poole at a lower commission rate for the sale of some such services, including managed scanning, for which Poole was paid an 8% commission.  Poole has not presented evidence contradicting this assertion, but at oral argument, Poole's counsel stated that he could not recall any such lower commission rate.

For the first seven years of his employment with Parameter, Poole reported to Renee Chronister, who was in charge of Parameter's sales and operations. However, beginning in 2018, Dave Chronister took over Parameter's sales. According to Poole, shortly after Dave Chronister took charge of sales, Parameter began paying Poole's commissions late or not paying them at all. According to Poole, Dave Chronister at times refused to discuss with Poole the status of his commissions and sales and refused to provide Poole an accounting of that information, stating that Parameter had "two sets of books" and that Poole was "not going to see that information." Poole Dep. at 175: 12-18.

## Employment Agreements

The day he was hired, October 3, 2011, Poole signed the following relevant documents: an Agreement for Employment ("Employment Agreement"), and a Non-Compete Agreement ("Non-Compete").[3] In short, these Agreements prevent Poole from (1) competing with Parameter's business for a period of 12 months following termination; (2) disclosing Parameter's confidential information and trade secrets to anyone, or using such information for his own benefit, at any time; (3) soliciting or accepting competitive business from those Parameter's customers with whom he had any contact or whom he had solicited during his last 12 months of employment with

---

[3]     Poole also signed a Mutual Non-Disclosure Agreement, but that Agreement is not at issue in the current motion.

Parameter, for a period of 12 months following termination; and (4) soliciting

Parameter's employees for a period of 12 months following termination.

I.    Employment Agreement

The Employment Agreement provided:

[I]n consideration of Employee's employment or continued employment with an Employer, access to Employer's confidential information, and the wages, salaries, bonuses and other benefits which will be given to Employee at this time or during such time as Employee is employed by Employer Entity, Employee hereby agrees to the following:

**Non-Solicitation**. During Employee's employment with Employer and, if the employment of Employee is terminated for any reason whatsoever, whether by Employee or Employer and whether with cause or without cause, for a period of 12 months[4] after the date of such termination (the "Termination Date"), Employee agrees that he or she will not, either personally or as an employee, agent, director, officer, shareholder, associate, partner, manager, owner, agent, advisor, independent contractor, proprietor, consultant or otherwise engage in the actions set forth in the following severable sub-parts: (a) directly or indirectly solicit or accept business from any customers, clients, or partners of Employer with which Employee had direct or indirect contact, or which were solicited by Employee during the 12 months[5] [*sic*] period immediately preceding the Termination Date, for products or services that are competitive with products or services provided by Employer as of the Termination Date; and (b) directly or indirectly solicit, hire, recruit, divert or take away from Employer the services of any of the employees or agents of Employer, or induce in any way any non-performance of any of the obligations of such employees or agents to

---

[4]     Parameter has attached a "true and correct" copy of the signed Employment Agreement to its verified complaint.  The Non-Solicitation paragraph quoted here contains two handwritten edits, in which two references to a period of "24 months" are crossed out and replaced with "12 months."  ECF No. 1-1 at ¶ 1.  These handwritten revisions were initialed by Poole.

[5]     As previously noted, the original Agreement provided for a 24-month period, but the handwritten edit changed the period to 12 months.

Employer; and (c) shall not own, manage, operate, consult, contract or be an employee or otherwise in a business substantially similar to or competitive with the present business of the Employer or such other business activity in which the Employer may substantially engage during the term of employment; and (d) At all times while this agreement is in force and after its expiration or termination, Employee agrees to refrain from disclosing Employer's customer lists, trade secrets, or other confidential material. Employee agrees not to make use of research done in the course of work done for Employer and agrees to take reasonable security measures to prevent accidental disclosure and industrial espionage.

ECF No. 1-1 at ¶ 1.

The Employment Agreement further provided that Poole "shall not, either during [his] employment or after such employment is terminated . . . , disclose, divulge, communicate . . . , or use for [his] own benefit" any Parameter trade secrets or "confidential information," unless such disclosure or use was "reasonably required in connection with [Poole's] employment by [Parameter]." *Id.* at ¶ 3(b). The Employment Agreement defined "confidential information" to include:

(a) books, records, and computer disks relating to the operation, finance, accounting, sales, personnel, training practices or management of Employer; (b) business plans and strategies; (c) sales and marketing plans and information; (d) customer names, addresses, telephone numbers, e-mail addresses, social security numbers, assets, and/or other non-public personal information regarding Parameter's . . . Clients and Consumers (Client Information) including customer vulnerabilities, security testing and findings, remediations, reports and any and all information security-related data as well as Partners; (e) price lists and pricing information; (f) cost lists and cost information; (g) the specific needs and requirements of particular customers; (h) customer service requirements; (i) pricing methods; (j) terms and conditions of customer contracts; and (k) to the extent not already covered by (a) through (j), all trade secrets of Employer. Employee understands that his/her obligation to maintain the confidentiality and security of the Employer's trade secrets and

Confidential Information[6] remains with him/her even after his/her employment with the Employer ends and continues for so long as such material remains a trade secret, non-public or constitutes Confidential Information.

*Id.* at ¶ 3(a).

The Employment Agreement stated that nothing therein altered the employment-at-will relationship and included an acknowledgment that violation of the Agreement would result in irreparable injury warranting injunctive relief. *Id.* at ¶¶ 7-8.

II.     Non-Compete

The Non-Compete provided:

For good consideration and as an inducement for Parameter Security (Company) to employ John Poole (Employee), the undersigned Employee hereby agrees not to directly or indirectly compete with the business of the Company and its successors and assigns during the period of employment and for a period of 1 year following termination of employment and notwithstanding the cause or reason for termination.

The term "not compete" as used herein shall mean that the Employee shall not own, manage, operate, consult, contract or be an employee in a business substantially similar to or competitive with the present business of the Company or such other business activity in which the Company may substantially engage during the term of employment.

ECF No. 1-2.

Next, the Non-Compete required that Poole refrain, for a period of 12 months after termination, from: (1) "directly or indirectly solicit[ing] business from customers, clients,

---

[6]     The Agreement does not consistently capitalize the term "confidential information."

partners and the like of Company[7] [or] engag[ing] in . . . any enterprise conducting

business activities that are the same or similar to those of Company"; (2) "solicit[ing]

orders, directly or indirectly, from any customers or partners of Company, or from any

customers of its successor, for such products/services as are sold by Company and its

successor, either for himself or as any employee . . . of any person, firm, or corporation";

and  (3) "directly or indirectly solicit[ing] any . . . employee of Company for employment

elsewhere . . . ."  *Id.*

Finally, like the Employment Agreement, the Non-Compete prohibited Poole from

"disclosing Company's customer lists, trade secrets, or other confidential material," and

from "mak[ing] use of research done in the course of work done for Company" at any

time, even "after [the Non-Compete's] expiration or termination."  *Id.*  The Non-Compete

contained a statement acknowledging that "the Company shall or may in reliance of this

agreement provide Employee access to trade secrets, customers, and other confidential

data and good will."  *Id.*

**Change in Poole's Commissions**

According to Poole, in May 2019, he went on vacation and was gone for more

than two weeks.  Prior to leaving, he set up an automatic reply email to existing clients

---

[7]     The Non-Compete provided that the "Employee's bar from soliciting business
form 'customers, clients, or partners' of Company applies to all individuals or entities
who were or are 'customers, clients or partners' of Company at any time during the
Noncompete Period."  ECF No. 1-2.

indicating that, in his absence, they should contact Dave Chronister.  Poole contends that, upon his return, Parameter informed him that Dave Chronister and others had made sales to existing clients and that, as a result of these relationships, Parameter no longer needed Poole's services.  Poole testified in his deposition that Dave Chronister told Poole that Poole was "of no value to this relationship anymore."  Poole Dep. at 137:4-7.  Poole also contends that, shortly thereafter, on June 26, 2019, Dave Chronister emailed Parameter's human resources provider to inquire about terminating Poole.  However, Parameter did not terminate Poole at that time.

In July 2019, Dave Chronister proposed changing Poole's commission structure and salary in order to reduce Poole's commission rate on sales to existing clients but increase Poole's base salary.  Specifically, on July 15, 2019, Chronister emailed Poole a proposal to:  (1) keep his commission on sales to new customers at 15%; (2) change his commission on sales to existing customers to 5%; and (3) give Poole a $22,000 raise to his base salary, from approximately $50,000 at the time to a little over $70,000.  The email included a spreadsheet with a detailed breakdown of the proposal.  Per Chronister, this was done because Poole was not focusing sufficiently on new customers, as opposed to existing customers.

On July 22, 2019, Poole sent Chronister a text message saying that the spreadsheet "looks good" but that he wanted to discuss it further.  ECF No. 29-3 at 28.  Specifically, Poole had questions regarding how a sale would be attributed to a new customer as

opposed to recurring business.  The parties dispute whether Poole ever agreed to the changes in his commission and pay structure.

According to Parameter, Chronister and Poole agreed to establish a cutoff date of August 1, 2019, such that sales to existing customers after August 1, 2019 would be paid at a 5% commission rate, whereas sales to new customers after that date would be paid at a 15% commission rate.  Chronister has attested by affidavit as follows:  "Poole placed a copy of the plan on my desk along with a handwritten note indicating his agreement to the new plan.  I believe I tossed this note in the wastebasket shortly after receiving it; I have searched for it several times in conjunction with this lawsuit, but have been unable to locate it."  ECF No. 29-3 at 5.

Poole denies that the parties ever reached agreement as to the change in commissions. Rather, Poole contends that he objected to the changes and the parties never agreed as to what would constitute a new or an old sale.  However, Poole admits that he has no evidence of such objections aside from his own deposition testimony. Poole also denies giving Chronister any correspondence with respect to the new proposal.

Poole contends that because commissions represented such a large part of his income at Parameter, the change in commission structure would have significantly cut his pay.  However, Poole has not presented evidence regarding how much of Poole's sales were sales to existing versus new customers.

On August 1, 2019, Parameter implemented Poole's new commission structure and salary increase. The parties dispute whether Poole voiced any opposition to these changes. However, it is undisputed that Poole began receiving the $22,000 base salary increase as of August 1, 2019, and he accepted that salary until he resigned.

**Poole's Resignation from Parameter and Dispute Over Unpaid Commissions**

On or about July 26, 2019, Poole met with NTP's founder, Wren, for coffee, and approximately three days later, Poole emailed Wren and expressed an interest in learning more about NTP. Sometime in August of 2019, Wren expressed to Poole that NTP would be happy to have him.

On September 3, 2019, Poole resigned from Parameter. In his resignation letter, Poole attached a list of 29 commission payments totaling approximately $40,000 that he believed remained outstanding as of the date of his resignation. The resignation letter did not mention the change in commission structure, and the parties agree that only one of the commissions on Poole's list would have been subject to the new commission structure.

According to Parameter, the large majority of these claimed commissions related to sales which had not been completed as of the date of Poole's resignation because no payment had been made by the customer at that time. Parameter contends that other commissions on Poole's list had already been paid in full to Poole many months prior or were otherwise not owed because, for example, the sale was never made, was a duplicate entry, or was made by someone other than Poole.

For commissions for which a sale was completed and payment received from the customer by the time Poole's last paycheck was due, Parameter paid such commissions with Poole's last paycheck. Further, on November 2, 2019, after this lawsuit was filed, Parameter paid Poole an additional $12,196.28 in commissions. In its letter to Poole transmitting this payment (ECF No. 29-3 at 35-41), Parameter explained that this payment was primarily for (1) Poole's sales for which Parameter had not received customer payment until after Poole's resignation, or (2) Poole's sales for which Parameter still had not (by November 2, 2019) received customer payment but for which Parameter was accelerating payment of a commission to Poole. Further, Parameter conceded that another commission on Poole's list was due to Poole at the time of Poole's resignation but that Parameter's failure to pay it was inadvertent. This commission totaled $1,836.68 and was paid to Poole as part of the November 2, 2019 payment.

However, Parameter has refused to pay Poole the other commissions on Poole's list that Parameter contends are not due to Poole. Parameter explained its position with respect to each of these commissions in its November 2, 2019 letter to Poole. At the hearing, Poole did not present evidence with respect to the commissions that Parameter contends are not owed.

Parameter further asserts that Poole's resignation letter was the first time that Poole mentioned that he believed any commission payments were missed. Poole disputes these assertions and claims that he voiced his concerns to Dave Chronister, as noted

above, and that he also sent an email about outstanding commissions he believed were owed to him in the summer of 2019.  Poole has not produced such an email in this Court, and Parameter maintains that no such email exists.

## NTP

NTP is a cyber-security company owned by David Wren.  NTP is located in Ellisville, Missouri, approximately 20 miles away from Parameter's office.  Its products and services include security assessments, penetration testing, web application assessments, social engineering, and VCISO services.

NTP's primary sales focus is "ARGISS," a managed detection and response ("MDR") platform created by NTP.  MDR is an industry term used to describe products and services offered to companies to detect and respond to cybersecurity and network threats.  According to Parameter, MDR and SIEM products offer similar functionality, and NTP's ARGISS is similar to the SIEM products that Parameter sells.  However, NTP and Poole contend that ARGISS is directed toward smaller companies and does not compete with the MDR products that Parameter sells.  NTP and Poole contend that NTP's MDR product involves ongoing hourly and daily network monitoring, whereas Parameter has specifically stayed away from such daily or hourly monitoring because it did not have the resources to provide such services.  NTP sells ARGISS as part of two packages:  a "first tier" package which includes the MDR as a standalone product, and a "second tier" package that includes MDR and NTP's other services as described above.

**Poole's Employment with NTP**

On September 5, 2019, Wren sent Poole a written offer of employment as an account executive at NTP, which Poole accepted. Poole began working at NTP on or about September 19, 2019. Poole is currently one of NTP's four salespeople responsible for selling all of NTP's technical products and services, including ARGISS and the other services described above.

Prior to offering Poole employment, Wren was informed of Poole's employment agreements with Parameter, and Wren told Poole to honor those agreements. However, Wren had not seen those agreements before this lawsuit was filed and did not conduct any investigation to determine whether Poole was in breach of those agreements. Wren also testified in his deposition in this case that he would not allow NTP to use Parameter's confidential information and that he would shred such information if it was ever found.

**Poole's Post-Resignation Contacts with Parameter Customers**

As part of its investigation into this case, Parameter discovered that on June 28, 2019, Poole emailed himself a list of Parameter customers and contact information. Then, within 24 hours after his resignation from Parameter, Poole emailed two of Parameter's customer contacts informing them of his resignation. He emailed one of these contacts that he hoped they could "stay in touch and potentially work together again in the future," and the other that he hoped they could "remain in touch going forward"

and to "[p]lease let [him] know if [he could] be of any assistance" to the customer. ECF No. 31 at 111, 114.

Over the next several weeks, Poole sent dozens of emails and LinkedIn messages to Parameter's customers and prospective customers soliciting their business for NTP. In these messages, Poole expressed a desire to work with the customers again and also compared NTP's products to Parameter's, emphasizing NTP's lower price. For example, on October 9, 2019, Poole emailed a Parameter customer for whom Poole performed work while employed by Parameter earlier in the year. In this email, Poole gave the customer his new contact information; informed the customer that he resigned from his old position and moved to NTP; stated that NTP's product was "really a low cost security service"; "equate[d] [NTP's product] as a type of Alien Vault and Carbon Black[8] combination at a much reduced cost to our clients and partners"; and stated that the product was "a great stepping stone for a maturing IT group that is scalable up to some of our fortune 500 clients." ECF No. 31 at 139. According to Parameter, these solicitations were sent to customers about whom Poole had acquired confidential information— including the customers' needs, specifications, pricing, and contracts—through his employment at Parameter.

On September 19, 2019, Parameter wrote Poole a letter demanding that he cease and desist from further employment in violation of his non-compete agreements and that

---

[8]     Carbon Black, like AlienVault, is a Parameter SIEM product.

The same day, Parameter also wrote to NTP to provide notice of Poole's Agreements with Parameter.

Parameter asserts that Poole continued to send solicitations to Parameter's customers and prospective customers, including some of the solicitations described above, even after Poole received Parameter's cease-and-desist letter.

**Parameter's Complaint in this Court**

On October 9, 2019, Plaintiff filed the current verified complaint against both Poole and NTP. The complaint contains nine counts: (1) breach of the Employment Agreement and Non-Compete against Poole; (2) trade secret misappropriation under the federal Defend Trade Secrets Act, 18 U.S.C. §1836, et seq., against both Defendants; (3) trade secret misappropriation under the Missouri Uniform Trade Secrets Act, Mo. Rev. Stat. § 417.450, et seq., against both Defendants; (4) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq., against Poole; (5) tortious interference with contract against NTP; (6) breach of fiduciary duty against Poole; (7) conversion against both Defendants; (8) unjust enrichment against both Defendants; and (9) a request for preliminary and permanent injunction against both Defendants.[9] *Id.* at 6-7. Parameter seeks injunctive relief, money damages, and attorneys' fees.

---

[9] The Court has subject matter jurisdiction because Parameter asserts claims arising under federal law, including under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b). 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Parameter's state-law claims because those claims arise from the same or similar operative facts and are "part of the same case or controversy" as the federal claims. 28 U.S.C. § 1367.

In conjunction with its complaint, Parameter moved for a temporary restraining order to prevent Poole from further employment at NTP or engaging in further solicitation of Parameter's customers. However, on October 18, 2019, the parties entered into an Agreed Temporary Injunction which required Poole to temporarily refrain from engaging in competitive activities on behalf of NTP while the parties conducted discovery and briefed the current motion.

**Motion for Preliminary Injunction**

Parameter brings this motion for a preliminary injunction only with respect to its breach of contract claim against Poole (Count 1). Parameter requests preliminary injunctive relief to restrain Poole from: (1) "maintain[ing] employment at NTP or any other entity in the information security and digital forensics industry for the purpose of selling information security or digital forensics services";[10] (2) "solicit[ing] or accept[ing] business from Parameter customers he solicited or had contact with during his last 12

---

[10]     Although Parameter's motion (ECF No. 27) sought to enjoin Poole from "further employment at NTP or any other competitive employment in the information and digital forensics industry" in any capacity, its Proposed Conclusions of Law (ECF No. 45-1) submitted to this Court shortly before the preliminary injunction hearing sought this more limited injunction against employment at NTP or other competitive entities "*for the purpose of selling information security or digital forensics services*." *See* ECF No. 45-` at 14 (emphasis added). The Court will therefore adopt this more limited language proposed by Parameter.

months with Parameter"; and (3) "us[ing], disclos[ing], or possess[ing] any Parameter

confidential information." ECF No. 45-1 at 14.

In response, Defendants[11] argue that Parameter has not met its burden of

establishing that a preliminary injunction is warranted. In particular, Defendants argue

that Parameter has not established a likelihood of success on the merits because any non-

compete agreement is unenforceable due to Parameter's prior breach of the employment

agreements by unilaterally changing and altering the manner in which Poole was paid

over Poole's objection.

Poole has also filed a counterclaim against Parameter, seeking an accounting of all

commissions due to Poole (Count I), alleging breach of contract (Count II), and alleging

violation of the Missouri Commission Statute, Mo. Rev. Stat. § 407.912 (Count III), for

failure to pay all earned commissions.

## DISCUSSION

## Preliminary Injunction Standard

"When determining whether to issue a preliminary injunction, the district court

considers: (1) the threat of irreparable harm to the movant; (2) the state of balance

between this harm and the injury that granting the injunction will inflict on other parties

litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the

---

[11]     Defendants Poole and NTP are represented by the same counsel and filed a joint
response.

public interest." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019).  In the Eighth Circuit, these four factors are known as the "*Dataphase*" factors, based upon the 1981 en banc case, *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

In each case, the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief.  *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir. 1986).  The party requesting injunctive relief bears the "complete burden" of proving that an injunction should be granted.  *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

## Likelihood of Success

To demonstrate a probability of success on the merits, the movant must show a "fair chance of prevailing."  *Minn. State High Sch. League*, 917 F.3d at 999.  "This fair-chance standard does not require the party seeking relief to show a greater than fifty per cent likelihood that he will prevail on the merits."  *Id.* (internal quotations and citations omitted).

I.      Breach of Contract

The Employment Agreement contains a Missouri choice-of-law provision, and the parties agree that Missouri law applies to Parameter's breach of contract claim.  To prevail on a breach of contract claim under Missouri law, a plaintiff must demonstrate (1) the existence and terms of a contract; (2) that the plaintiff performed or tendered

performance of the contract; (3) a breach of the contract by defendant; and (4) resulting

damages. [12] *Keveney v. Mo. Military Academy,* 304 S.W.3d 98, 104 (Mo. 2010).

"Much has been written about an employee's covenant against working for his

employer's competitors. Agreements of this kind restrain commerce and limit the

employee's freedom to pursue his or her trade. Enforcement of such agreements,

therefore, is carefully restricted." *Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71, 73–74

(Mo. 1985). The Missouri Supreme Court has identified the following four "valid and

conflicting concerns" at issue in the enforcement of non-compete agreements:

> First, the employer needs to be able to engage a highly trained workforce to
> be competitive and profitable, without fear that the employee will use the
> employer's business secrets against it or steal the employer's customers after
> leaving employment. Second, the employee must be mobile in order to
> provide for his or her family and to advance his or her career in an ever-
> changing marketplace. This mobility is dependent upon the ability of the
> employee to take his or her increasing skills and put them to work from one
> employer to the next. Third, the law favors the freedom of parties to value
> their respective interests in negotiated contracts. And fourth, contracts in
> restraint of trade are unlawful.

*Healthcare Servs. of the Ozarks, Inc. v. Copeland,* 198 S.W.3d 604, 609–610 (Mo.

2006) (internal citations omitted). In Missouri, restrictive covenants are enforceable only

to the extent that they are demonstrably reasonable by protecting an employer from

unfair competition without imposing unreasonable restraint on the former

employee. *Armstrong v. Cape Girardeau Physician Assocs.,* 49 S.W.3d 821, 825 (Mo.

---

[12] Defendants have not contested that the Agreements contain the traditional
contractual elements of offer, acceptance, and consideration. Rather, Defendants argue
that the Agreements should not be enforced for other reasons, such as Parameter's prior
breach.

Ct. App. 2001). "An employer may only seek to protect certain narrowly defined and well-recognized interests, namely its trade secrets and its stock in customers." *Id.* "The enforcing party must also show that the agreement is reasonable in scope, both as to place and as to time." *Id.* "The burden of demonstrating the covenant's validity is on the party seeking to enforce it." *Id.*

As for Parameter's argument that it is entitled to protect its customer contacts, "[t]he rationale for protecting customer contacts is that in the sales industry, a customer's goodwill toward a company is often attached to the employer's individual sales representative, and the employer's product or service becomes associated in the customer's mind with that representative." *Brown v. Rollett Bros. Trucking Co., Inc.,* 291 S.W.3d 766, 774 (Mo. Ct. App. 2009) (internal quotation marks and citation omitted); *see also W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 18 (Mo. 2012) ("Because sales personnel may exert a special influence over that customer and entice that customer's business away from the employer, the proper means of protection is a non-competition agreement.") (citation omitted).

"An employer has a legitimate interest in customer contacts to the extent it seeks to protect against the influence an employee acquires over his employer's customers through personal contact." *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 842 (Mo. 2012). But "[a]n employer must show that the employee had contacts of the kind enabling him to influence customers." *Brown*, 291 S.W.3d at 775. "[A]n employee's ability to influence customers depends on the quality, frequency, and duration of an employee's exposure to

an employer's customers, which is crucial in determining the covenant's reasonableness."
*Whelan Sec. Co.*, 379 S.W.3d at 842.

The Court finds that Parameter has established a fair chance of prevailing on the merits with respect to its contract claims so as to warrant injunctive relief against Poole. In particular, Parameter has made a sufficient showing that, by virtue of his position as Parameter's primary salesperson, with significant and extended exposure to Parameter's customers, Poole had a unique ability to influence customers.

Parameter has also made a sufficient showing that the one-year non-compete and non-solicitation provisions in the Agreements are likely to be found reasonable and enforceable. The lack of a geographical limit is not fatal. *See id.* at 842 ("Although restrictive covenants generally must be tailored narrowly in both temporal and geographic scope, courts have enforced customer non-solicitation clauses without a geographic limitation when other limitations to the prohibited conduct exist or when the employee had significant contact with a substantial number of the employer's customers.").

And even if a geographical limit were needed, Missouri courts allow for reformation to narrow the scope of a restrictive covenant as necessary. *See e.g., Mid-States Paint & Chem. Co. v. Herr*, 746 S.W.2d 613, 616 (Mo. Ct. App. 1988) ("[A]n unreasonable restriction against competition in a contract may be modified and enforced to the extent that it is reasonable, regardless of the covenant's form of wording."); *Sigma Chem. Co. v. Harris*, 794 F.2d 371, 374 (8th Cir. 1986) ("Missouri courts have decreed enforcement as against a defendant whose breach occurred within an area in which restriction would clearly be reasonable, even though the terms of the agreement imposed a

larger and unreasonable restraint.") (citation and quotation omitted). NTP is located roughly 20 miles from Parameter's office where Poole was employed, and the restrictive covenants may be modified by the Court to include an appropriate geographic limit.

At oral argument, Parameter suggested that a 50-mile radius may be appropriate, to cover St. Louis and its immediately surrounding areas, where Parameter's business is concentrated. The Court agrees and will reform the restrictive covenants here to limit the non-compete restriction to 50 miles from Parameter's office. *See, e.g.*, *Whelan*, 379 S.W.3d at 846–47 (holding that "[c]onsiderable precedent in Missouri supports the reasonableness of a two-year non-compete agreement for an operations manager that is limited to 50 miles from where services were rendered by the employee" and also finding enforceable a non-solicitation provision that, as reformed by the court, prohibited employees from soliciting their former employer's existing customers with whom the employees dealt during their employment).

Parameter has also demonstrated a sufficient likelihood of success with regard to Poole's breach of the non-compete and non-solicitation provisions of the Agreements. Poole has not seriously contested that he solicited Parameter's customers in violation of the Agreements. And although Poole notes some differences between NTP's and Parameter's business, the evidence at this stage, including Poole's own communications to Parameter's customers, strongly suggests that the two companies are competitors providing substantially similar services.[13]

---

[13]    For example, as Parameter notes, although Defendants characterize NTP's business as targeting smaller companies, Poole himself, in a post-resignation email to a Parameter

II. <u>Prior Material Breach</u>

Missouri "recognize[s] the general principle of contract law that 'a party to a contract cannot claim its benefits where he is the first to violate it.'" *Supermarket Merch. & Supply, Inc. v. Marschuetz,* 196 S.W.3d 581, 585 (Mo. Ct. App. 2006) (quoting *Forms Mfg., Inc. v. Edwards,* 705 S.W.2d 67, 69 (Mo. Ct. App. 1985)).  Specifically with regard to employment contracts, Missouri recognizes "that when an employer first breaches an employment agreement before the employee allegedly violates the non-competition agreement, the employer is barred from enforcing the restrictive covenant against the employee." *Id*.  The rationale for this rule is related to equitable defense of unclean hands and the idea "that one who has engaged in inequitable activity regarding the very matter for which he seeks relief will find his action barred by his own misconduct." *Adrian N. Baker & Co. v. Demartino*, 733 S.W.2d 14, 18 (Mo. Ct. App. 1987)

Nevertheless, the employer's prior breach must be "material" in order for the employee to avoid the restrictive covenants. *See Premier Golf Mo., LLC v. Staley Land Co., LLC,* 282 S.W.3d 866, 873 (Mo. Ct. App. 2009).  The question of whether a breach is material is "largely an issue of fact." *Forms Mfg.,* 705 S.W.2d at 69.  "An employer's unilateral change to an employment agreement may constitute a material breach of the agreement if it substantially alters the manner and/or amount that the employer pays the employee." *JumboSack Corp. v. Buyck*, 407 S.W.3d 51, 57 (Mo. Ct. App. 2013).

---

customer, described NTP's product as being "scalable . . . to some of our fortune 500 clients."  ECF No. 31 at 139.

Parameter has questioned whether this line of Missouri cases applies in an at-will employment relationship like Poole's, where the employer was free to alter the employee's rate of compensation and other terms of employment at will. But the Court need not resolve the question at this stage because, even assuming a prior material and unilateral change to Poole's compensation could render the restrictive covenants unenforceable, there is insufficient evidence of such a prior breach by Parameter here.

Specifically, Poole argues that Parameter committed a prior material breach of the applicable employment agreements in two respects: (1) changing the structure of Poole's commission rate as of August 1, 2019, to distinguish between sales to new and existing clients, and (2) failing to pay Poole certain commissions owed as of the time of Poole's resignation, which were largely unaffected by the change in commission structure.

Regarding the first alleged breach, Poole has not offered any evidence at this stage, other than his deposition testimony, that Poole objected to the change in commission rate. The Court is not a position to weigh Poole's credibility because Poole chose not to testify before the Court. And Poole conceded at oral argument that there is no other evidence before the Court at this stage to corroborate his assertion that he voiced objection to the change. Poole's resignation letter did not mention the change or reference it as a reason for his resignation. And Poole accepted the salary increase that accompanied the change to his commission, supporting Parameter's argument that Poole acquiesced to the change. *See, e.g., Ballesteros v. Johnson*, 812 S.W.2d 217, 222 (Mo. Ct. App. 1991) ("A person who accepts benefits under a contract will not be allowed to affirm a contract in part by accepting its benefits and disaffirm it in part by avoiding some of its obligations."); *cf.*

*Supermarket Merch.*, 196 S.W.3d at 587 (holding that an employee did not waive an employer's prior material breach by continuing to work for approximately 10 months after the employer unilaterally changed his compensation terms, where there was evidence that the employee continued to "voice[] his opposition" to the change over that period).

As to the second alleged breach, there is insufficient evidence at this stage to suggest that any more than $1,836.68 in commissions was in fact owed to Poole at the time of his resignation. The missed $1,836.68 payment, alone, does not appear to be a "material" breach. *See Ballesteros*, 812 S.W.2d at 222 (holding that where the employer calculated the employee's compensation in good faith, "[t]he fact that a few payments were made shortly after they were due does not constitute a material breach of the contract" so as to preclude enforcement of a covenant not to compete). The parties dispute whether Parameter owed Poole any more commissions at the time of Poole's resignation, and the Court does not have sufficient evidence at this stage to resolve that dispute. The evidence submitted thus far weighs against Poole, as it suggests that Poole was not typically paid commissions until Parameter received payment from a customer, and that Parameter paid Poole at least some of the commissions at issue once it received such customer payment. In short, the Court finds that Parameter has demonstrated a fair chance of prevailing on the merits.

### Remaining *Dataphase* Factors

The Court also finds that the remaining *Dataphase* factors weigh in favor of issuing a preliminary injunction. In light of the evidence that Poole almost immediately accepted a similar position with a direct competitor and began contacting Parameter

customers to promote NTP's products—including by directly comparing those products and NTP's prices for those products to Parameter's—notwithstanding his non-compete and non-solicitation agreements, convinces the Court that Parameter would suffer irreparable harm absent injunctive relief.  *See, e.g.*, *Church Mut. Ins. Co. v. Sands*, No. 14-CV-3119-S-DGK, 2014 WL 3907831, at *3 (W.D. Mo. Aug. 11, 2014) ("[T]he mere violation of a valid non-compete agreement can support an inference of the existence of a threat of irreparable harm.") (citing *N.I.S. Corp. v. Swindle*, 724 F.2d 707, 710 (8th Cir. 1984)).  Moreover, Poole acknowledged the risk of irreparable harm here by signing an Employment Agreement that stated as much.  *See Panera, LLC v. Nettles*, No. 4:16-CV-1181-JAR, 2016 WL 4124114, at *4 (E.D. Mo. Aug. 3, 2016) ("Courts regularly find irreparable harm where a non-compete agreement states that its breach constitutes irreparable injury.").

A preliminary injunction is also necessary and proper in light of the balance between the threat of irreparable harm to Parameter and the temporary, albeit appreciable, harm that the preliminary injunction may inflict on Poole, as well as the public interest. In weighing these factors, the Court notes that Poole's decades of sales experience prior to joining Parameter qualifies him for a wide market of job opportunities that do not compete with Parameter.

Moreover, as noted above, Parameter does not seek an injunction preventing Poole from working for NTP entirely.[14]  Nor will the Court order such relief.  Rather, the

---

[14]     At the preliminary injunction hearing, the Court noted this fact and further indicated that, because NTP admittedly hired Poole with the knowledge that Poole was

preliminary injunction will only prevent Poole from working for NTP, or other competitors of Parameter located within a 50-mile radius, in the capacity of selling information security or digital forensics services; from soliciting Parameter's customers whom Poole solicited or contacted during his last 12 months with Parameter; and from using, disclosing, or possessing Parameter's confidential information. So limited, and upon careful consideration of the *Dataphase* factors, the Court grant Parameter's motion for a preliminary injunction.

**Bond**

Federal Rule of Civil Procedure 65(c) provides that "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Court concludes that a bond in the amount of $50,000 is appropriate here.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's motion for a preliminary injunction is **GRANTED in part**, as set forth above. ECF No. 27.

---

subject to certain restrictive covenants and with the intent that Poole comply with such covenants, NTP could presumably continue to employ Poole in a manner that would not violate such covenants. Parameter did not object to the Court's statements in this regard or otherwise indicate that it was seeking to preclude Poole from employment at NTP entirely.

**IT IS FURTHER ORDERED** that, until further order of the Court, Defendant

John Poole shall be prohibited from:

1. Maintaining employment in a capacity that involves selling information security or digital forensics services at Wren & Associates, LLC, d/b/a Network Technology Partners ("NTP"), or any other entity in the information security or digital forensics industry located within 50 miles of the Parameter LLC, d/b/a Parameter Security's ("Parameter") office located at 122 S. Main Street, St. Charles, MO 63301;

2. Directly or indirectly soliciting or accepting business from Parameter customers that Poole solicited or had contact with during his last 12 months of employment with Parameter; and

3. Using, possessing, or disclosing any Parameter confidential information.

   **IT IS FURTHER ORDERED** that Plaintiff shall post, within forty-eight (48)

hours a bond in the sum of $50,000, in compliance with Rule 65(c) of the Federal Rules

of Civil Procedure.

   **IT IS FURTHER ORDERED** that the Court will schedule a Rule 16 conference

by separate order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 9th day of December, 2019.